1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

UNITED STATES DISTRICT COURT

Northern District of California

UNITED STATES OF AMERICA,

                Plaintiff,

   v.

JIE ZHONG,

                Defendant.

_____/

No. C 11-5112 MEJ

**FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING BENCH TRIAL; ORDER REVOKING AND SETTING ASIDE NATURALIZATION**

## I.  INTRODUCTION

Plaintiff United States of American brings this action pursuant to 8 U.S.C. § 1451(a), seeking to revoke and set aside the order admitting Defendant Jie Zhong to citizenship and to cancel his Certificate of Naturalization.[1]  Compl. ¶ 1, Dkt. No. 1.  After the Court denied the parties' cross-motions for summary judgment, finding that triable issues of fact existed on each of the Government's four claims, the Court set this matter for trial.  Dkt. No. 36.  On March 13, 2013, the Court held a bench trial.  Following trial, the Court took the matter under submission and granted the parties leave to submit closing briefs and revised proposed findings of fact and conclusions of law.  Dkt. Nos. 72 (Def. Br.), 74 (Gov. Br.).  Having carefully considered the testimony at trial, the administrative record, the parties' written arguments, and the controlling legal authorities, the Court now issues the following findings of fact and conclusions of law and **GRANTS** the Government's request for denaturalization of Zhong.  Zhong's certificate of citizenship is hereby **CANCELED** and the order admitting him to citizenship is **REVOKED** and **SET ASIDE**.

---

[1] This Court has jurisdiction pursuant to 28 U.S.C. § 1345.

**II.  PROCEDURAL HISTORY**

On October 19, 2011, the Government filed a Complaint to Revoke Naturalization pursuant to 8 U.S.C. § 1451(a), seeking to denaturalize Zhong.  As required, the Government filed as an exhibit to the Complaint the Affidavit of James Burke, a Senior Special Agent for the United States Immigration and Customs Enforcement ("ICE"), United States Department of Homeland Security ("DHS"), showing good cause for this action.  Compl. ¶ 2, Dkt. No. 9 (Burke Affidavit).  The Complaint asserts four claims against Zhong seeking denaturalization pursuant to 8 U.S.C. § 1451(a).

In Count One, the Government alleges that because Zhong admitted that he was never affiliated with Falun Gong, was never persecuted in China, and never feared persecution based on such affiliation in China, Zhong did not meet the definition of a "refugee" under 8 U.S.C. § 1101(a)(42), and therefore obtained his asylum status, and thereby his Lawful Permanent Resident ("LPR") status, fraudulently.  Compl. ¶¶ 32-40.  The Government therefore asserts that Zhong illegally procured his naturalization, making revocation pursuant to 8 U.S.C. § 1451(a) appropriate.

In Count Two, the Government charges that because Zhong procured his asylum status by fraud and willful misrepresentation of material facts, he was inadmissible to the United States and was not lawfully admitted to the United States as a LPR, disqualifying him for naturalization.  *Id*. ¶¶ 41-46.  It therefore asserts that because Zhong was ineligible for naturalization, Zhong illegally procured his naturalization and it must be revoked pursuant to 8 U.S.C. § 1451(a).  *Id*. ¶ 47.  The Government further charges that because Zhong entered into a fraudulent marriage with his second wife, Nicole Williams, in an attempt to expedite his LPR status, he sought to procure a visa by fraud and was thus inadmissible to the United States, making him ineligible for naturalization and making revocation of his naturalization appropriate pursuant to 8 U.S.C. § 1451(a).  *Id*. ¶¶ 48-51.

In Count Three, the Government alleges that because Zhong provided false testimony about his membership in Falun Gong and denying that he had ever given false or misleading information to any United States government official while applying for an immigration benefit, Zhong was precluded from establishing good moral character under 8 U.S.C. § 1101(f)(6) and was ineligible for naturalization for lack of good moral character under 8 U.S.C. § 1427(a)(3).  *Id*. ¶¶ 52-61.  It alleges

UNITED STATES DISTRICT COURT
For the Northern District of California

2

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1  that as a person ineligible to naturalize, Zhong illegally procured his naturalization and it must be

2  revoked pursuant to 8 U.S.C. § 1451(a).  *Id.* ¶ 62.

3        In Count Four, the Government alleges that Zhong willfully misrepresented and concealed

4  material facts on his naturalization application when he claimed that he had never provided false or

5  misleading information to any United States government official while applying for any immigration

6  benefit.  *Id.* ¶ 64.  It further alleges that he provided false and misleading information at his

7  naturalization interview when he orally testified that he had been a member of Falun Gong.  *Id.* ¶ 67.

8  It alleges that by misrepresenting material facts, Zhong was able to procure his naturalization and it

9  must therefore be revoked, as provided for by 8 U.S.C. § 1451(a).  *Id.* ¶¶ 68-69.

10        On October 25, 2012, the parties filed cross-motions for summary judgment.  Dkt. Nos. 22

11  (Gov. MSJ), 30 (Def. MSJ).  In its Motion, the Government argued that Zhong is subject to

12  denaturalization on three grounds.  First, it asserted that at the time Zhong was naturalized, he was

13  not lawfully admitted to the United States for permanent residence because he obtained asylee status

14  based on a fraudulent claim that he practiced Falun Gong and because he previously tried to procure a

15  visa predicated on a fraudulent marriage to his second wife, both of which rendered him inadmissible

16  for naturalization.  Dkt. No. 22 at 1.  Second, the Government argued that Zhong illegally procured

17  his naturalization because he did not satisfy the good moral character requirement after he provided

18  false testimony under oath when he testified about his asylum application.  *Id.* at 1-2.  Third, the

19  Government asserted that Zhong procured his naturalization by concealing and willfully

20  misrepresenting material facts about his asylum fraud to the United States Citizenship and

21  Immigration Services ("USCIS") throughout his naturalization process.  *Id.* at 2.  The Government

22  thus urged the Court to revoke Zhong's naturalization under 8 U.S.C. § 1451(a).

23        Zhong, however, maintained that USCIS properly granted him asylum based on his

24  involvement with Falun Gong, that his second marriage was valid, and that he did not conceal or

25  provide misleading information and thus did not illegally procure naturalization.  Dkt. No. 30.

26        On November 29, 2012, the Court held a hearing on the parties' cross-motions for summary

27  judgment.  It issued an order denying the motions on December 12, 2012.  Dkt. No. 36.  The Court

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1   first found that triable issues of fact existed with respect to the legitimacy of Zhong's marriage to

2   Williams, and thus the issue of whether Zhong sought to procure an immigration benefit by marriage

3   fraud. *Id.* at 17. With respect to the Government's claim that Zhong was never a refugee within the

4   meaning of 8 U.S.C. § 1101(a)(42), making him ineligible to obtain lawful permanent resident status

5   pursuant to 8 U.S.C. § 1159(b)(3), and thus was not a lawfully admitted permanent resident when he

6   applied to become a citizen, the Court found that triable issues of fact existed about whether Zhong

7   qualified to be a refugee. *Id.* at 17-18. As to the Government's claim that Zhong illegally procured

8   his naturalization because he lacked the good moral character required to naturalize required by 8

9   U.S.C. § 1427(a)(3) based on alleged false testimony, the Court found that issues of credibility

10  precluded the Court from making any determination as to the veracity of statements Zhong made

11  under oath which would reflect on his moral character. *Id.* at 19-20. Finally, as to the Government's

12  charge that Zhong willfully misrepresented and concealed material facts on his naturalization

13  application, the Court found that the issue could not be resolved based on the parties' written

14  submissions because it raised credibility determinations. *Id.* at 20-21.

15          The Court held a bench trial on March 13, 2013. During trial, the Court heard live testimony

16  from Zhong, Williams, USCIS Officer Corynne Condon, and Agent Burke.

17          The Court now makes the following factual findings and legal determinations.

### III.  FINDINGS OF FACT

19  1.      Zhong is a native of the People's Republic of China. Joint Proposed Findings of Fact and

20  Conclusions of Law ("JF&C") ¶ 1, Dkt. No. 60; Trial Exhibit ("Ex.") 1 (5/9/2000) (Application for

21  Asylum) at DOJ-000177.[2]

22  2.      On February 10, 1999, he entered the United States at Chicago, Illinois on a visitor's visa.

23  JF&C ¶ 1; Ex. 1 at DOJ-000177 March 13, 2013 Trial Transcript ("Tr.") at 6:19-23.

24  3.      The following year, on May 9, 2000, Zhong applied for asylum with the former Immigration

25  and Naturalization Service in San Francisco, now USCIS. JF&C ¶ 2; Ex. 1 at DOJ-000177.

---

27          [2] When available, the Court will cite to the BATES numbering on documents the parties
28  have referenced.

4

UNITED STATES DISTRICT COURT
For the Northern District of California

4.      Page 8, Part F of the Asylum Application contains a section titled "Signature of Person Preparing Form if Other Than Above."  JF&C ¶ 2; Ex. 1 at DOJ-000184.  Part F contains the signature and information of a person named "Steve Mao" as the preparer.  *Id.*

5.      In his Declaration in Support of Asylum Application, Zhong indicated that he was "applying for asylum because Falun Gong (FLG) has been labeled as an 'illegal evil cult' by the Chinese government and ruthlessly persecuted in P.R. China since last year."  Ex. 1 at DOJ-000185.

6.      Zhong claimed that he began practicing Falun Gong with his father in 1997.  JF&C ¶ 3. Zhong also claimed that while living in China, he and his father attended weekly Falun Gong meetings, practiced Falun Gong exercises, and shared his experiences.  *Id.* ¶ 4.

7.      Zhong further represented that, in August 1998 he gave a speech to fellow Falun Gong practitioners about his experiences as a Falun Gong member, and that after he left China, his father was arrested and detained for one week for participating in a Falun Gong sitting protest.  *Id.* ¶ 5.

8.      In his Declaration, under a heading titled, "Why I Fear to Return to China Now," Zhong stated:

> If I return to China, the Chinese Government will arrest me immediately because I had given a speech to introduce my experience in our country in 1998.  After I came to the U.S. I wrote two letters to my father discussing FLG, but these two letters had become evidence showed to my father when he was detained.  And also many disciples had been arrested after they return to China, that reminds me that when we were exercise FLG in Golden [G]ate [P]ark some people took picture, maybe that is employee of Chinese embassy for searching FLG practitioner.  Under such environment, I have no doubt that if I return to China, I would be immediately arrested and detain.  I could not imagine what would happen to me thereafter.  I have no way out but to seek protection of the U.S. government.

Ex. 1 at DOJ-000186.  Thus, Zhong claimed that he would be arrested if he returned to China due to his Falun Gong practice.  JF&C ¶ 6.

9.      In support of his Application, Zhong also submitted photographs of himself practicing Falun Gong in San Francisco, California.  JF&C ¶ 6; Ex. 1 at DOJ-000194, DOJ-000195.

10.     On June 26, 2000, USCIS granted Zhong's Asylum Application.  JF&C ¶ 7; Ex. 1 at DOJ-000177.

11.     A year after his asylum application was granted, on June 29, 2001, Zhong filed a Form I-485,

UNITED STATES DISTRICT COURT
For the Northern District of California

Application to Register Permanent Residence or Adjust Status, pursuant to Immigration and Nationality Act ("INA") section 209(b), 8 U.S.C. § 1159(b), seeking to adjust his status from asylee to LPR (the "first adjustment application"). JF&C ¶ 8; Ex. 2 DOJ-000108.

12.     On October 1, 2001, Zhong married Yue "Julia" Chen. JF&C ¶ 9.

13.     In April 2004, Zhong and Chen's first child was born. *Id*. ¶ 10.

14.     On July 5, 2005, Zhong divorced Chen in Nevada. *Id*. ¶ 11; Ex. 3; Tr. 7:25-8:1. The divorce petition stated that they resided separately, Chen in Nevada and Zhong in California, and that they had no children. Ex. 3 at DOJ-000099. However, Zhong testified that, in fact, Chen did not live in Nevada; rather, he and Chen lived in the same house in California and had one child. Tr. 8:9-19.

15.     Subsequently, on August 4, 2005, Zhong married Williams, a United States citizen. JF&C ¶ 12; Ex. 4; Tr. 10:11-13. At that time he married Williams, Zhong was still living with Chen. Tr. 14-16.

16.     Zhong testified that he knew before he married Williams that he could obtain lawful permanent resident status based on a marriage to a United State citizen. Tr. 12:20-22. He also testified that he knew that it was faster to get a green card based on marriage to a citizen than to get a green card based on asylum. Tr. 12:23-13:1.

17.     On November 29, 2005, Williams filed a Form I-130, Petition for Alien Relative, with USCIS to obtain a visa for Zhong as the spouse of a United States citizen. JF&C ¶ 13; Ex. 5; Tr. 83:18-84:7.

18.     Concurrently, on November 29, 2005, Zhong filed an I-485, Application to Register Permanent Residence or Adjust Status, based on his marriage to Williams (the "second adjustment application"). JF&C ¶ 14; Ex. 6; Tr. 11:4-9.

19.     Although Zhong indicated on his second adjustment application that he and Williams lived together, they did not. Ex. 6 at DOJ-000051; Tr. 13:22-14:11. Rather, Zhong continued to live with Chen. Tr. 14:12-14.

20.     Zhong's second adjustment application included a Form I-864 Affidavit of Support Under Section 213A of the Act, which stated that Williams resided at 1009 Craftsman Drive, Hercules, California. Ex. 6 at DOJ-000051; Tr. 13:22-14:9. Williams did not live at that address, nor has she

ever lived there.  Tr. 14:10-11.

21.     On February 2, 2006, USCIS approved Zhong's first adjustment application and he was adjusted to LPR status, effective February 2, 2005.  JF&C ¶ 15; Ex. 2 at DOJ-000108.

22.     On February 14, 2006, Williams withdrew the I-130 Petition for Alien Relative she had filed on Zhong's behalf because USCIS had approved his first adjustment application.  JF&C ¶ 16.

23.     The following month, on March 9, 2006, USCIS denied Zhong's second adjustment application because he failed to appear for an interview before USCIS.  JF&C ¶ 17; Ex. 6 at DOJ-000037; Ex. 7.

24.     On October 26, 2006, Zhong filed for divorce from Williams in California; the marriage terminated on January 17, 2007.  JF&C ¶ 18; Ex. 8; Tr. 14:20-15:13.

25.     By the time Zhong's divorce from Williams was final, Chen was pregnant with Zhong's second child.  Tr. 15:20-22.  In August 2007, Zhong and Chen's second child was born – which was approximately seven months after his divorce from Williams was final.  JF&C ¶ 19; Ex. 9 at 6 (Part 9(b)); Tr. 15:23-16:2.

26.     On November 5, 2009, Zhong filed an N-400 Application for Naturalization with the San Francisco District Office of USCIS, based upon his putative eligibility to naturalize for having been a LPR for at least five years.  JF&C ¶ 20; Ex. 9; Tr. 17:2-10.

27.     Part 10, question 23 of the N-400 naturalization application asked, "Have you ever given false or misleading information to any U.S. Government official while applying for any immigration benefit or to prevent deportation, exclusion, or removal?"  JF&C ¶ 22; Ex. 9 at 8.  In response to this question, Zhong stated "No."  JF&C ¶ 22; Ex. 9 at 8; Tr. 17:24-18:12.

28.     Part 8, Question A of the N-400 naturalization application asked, "How many times have you been married (including annulled marriages)?"  JF&C ¶ 21, Ex. 9 at 4; Tr. 18:16-24.  In response, Zhong stated that he had been married twice.  JF&C ¶ 21, Ex. 9 at 4; Tr. 18:16-19:2.

29.     On November 4, 2009, Zhong signed his N-400 Application for Naturalization under penalty of perjury, thereby swearing or affirming that the contents of his naturalization application were true and correct.  JF&C ¶ 23; Ex. 9 at 10; Tr. 17:8-10.

UNITED STATES DISTRICT COURT
For the Northern District of California

7

UNITED STATES DISTRICT COURT
For the Northern District of California

30.     Thereafter, on December 3, 2009, Zhong married Florence Ly.  JF&C ¶ 24; Ex. 19; Tr. 16:5-17.

31.     In December 2009, a child was born to Zhong and Ly.  JF&C ¶ 24; Tr. 16:10-21.  Zhong and Chen continued to reside in the same house.  Ex. 13 at DOJ-000226.

32.     On January 22, 2010, USCIS Officer Koreti Alefosio interviewed Zhong under oath about his N-400 Application for Naturalization.  JF&C ¶ 25; Ex. 9; Tr. 17:21-23.

33.     Officer Alefosio also asked Zhong whether he had ever been a member of a group, club, party, or organization anywhere in the world, including the United States, and Zhong answered that he had been a member of Falun Gong.  JF&C ¶ 26.  Officer Alefosio noted this answer on Zhong's N-400 application in red ink.  *Id.*; Ex. 9 at 7.

34.     Officer Alefosio also asked Zhong whether he had ever given false or misleading information to any United States government official while applying for any immigration benefit, to which Zhong responded that he had not.  JF&C ¶ 27; Ex. 9 at 8; Tr. 17:21-18:15.

35.     Part 8, Question A of the naturalization application asked, "How many times have you been married, including annulled marriages?"  Ex. 9 at 4; Tr. 18:16-24.  Zhong orally affirmed his written answer, "2."  Tr. 18:16-24.  At the time of the naturalization interview on January 22, 2010, the true answer to Question A was "3."  Tr. 18:25-19:2.

36.     Part 9 of the N-400 naturalization application requested information about Zhong's children.  Ex. 9 at 6; Tr. 19:5-12.  Section B of Part 9 states, "provide the following information about all of your sons and daughters.  If you need more space, use a separate sheet of paper."  Ex. 9 at 6; Tr. 19:8-12  Zhong listed two children with Chen, but did not list his child with Ly.  Ex. 9 at 6; Tr. 19:5-20:5.

37.     At the end of the naturalization interview, Zhong signed a sworn statement stating that the contents of his application, as amended during the interview, were true.  JF&C ¶ 28; Ex. 9 at 10; Tr. 17:11-13.

38.     On February 2, 2010, USCIS approved Zhong's Form N-400 application, based upon his answers on the N-400 application, his sworn testimony during the interview, and the documentation he submitted in support of the application.  JF&C ¶ 29; Ex. 10.

8

UNITED STATES DISTRICT COURT
For the Northern District of California

39.     A month later, on March 10, 2010, Zhong filed for divorce from Ly in Nevada.  JF&C ¶ 30; Ex. 20.  The divorce petition stated that Ly resided in Nevada and Zhong resided in California, and that they had no children.  JF&C ¶ 30; Ex. 20 at 4; Tr. 23:8-11.  In fact, Ly did not live in Nevada and she and Zhong had one child.  Tr. 16:20-21, 23:6-11.  The judge entered a final decree on March 10, 2010, and the Decree of Divorce was filed on March 12, 2010.  JF&C ¶ 30; Ex. 20 at 1, 4.

40.     On March 10, 2010, Zhong completed a Form N-445, Notice of Naturalization Oath Ceremony, in which he certified that after the date was interviewed on his N-400 Application for Naturalization and before the date of the oath ceremony, there had not been any significant events that occurred regarding his personal life, including marriage or divorce.  JF&C ¶ 31; Ex. 10 at DOJ-000004; Tr. 20:9-21:5.

41.     On March 10, 2010, Zhong took the oath of allegiance and was admitted to United States citizenship.  JF&C ¶ 32; Ex. 10.  He was issued Certificate of Naturalization number 32471265.  JF&C ¶ 32.

42.     On March 22, 2010, Zhong and Chen remarried.  *Id.* ¶ 33.

43.     Thereafter, Zhong filed an I-130 Petition for Alien Relative on Chen's behalf, and she concurrently filed an application for adjustment of status.  *Id.* ¶ 34.

44.     In late 2010, USCIS Officer Corynne Condon began investigating Zhong following the grant of his naturalization application.  Tr. 77:23-79:3.  Because she believed that there were some indications of marriage fraud, Officer Condon located and contacted Williams and met with her in person on November 4, 2010.  Tr. 79:16-83:11.

45.     On November 4, 2010, Officer Condon obtained an affidavit from Williams wherein she stated:

> My name is Nicole Williams.  Yes, I married Jie Zhong.  Jie and I never had sex.  We never lived together.  I married Jie as a favor and to get a little money.  Jie and I had a friend name [sic] Steve who hooked us up.  But Steve took most of the money and disappeared.  I've been to visit the house that Jie shared with his wife during our marriage, at 1009 Craftmans Dr., Hercules, CA.

JF&C ¶ 35; Ex. 11 at DOJ-000223; Tr. 67:5-69:6, 85:18-25.

46.     At trial, Williams invoked her rights under the Fifth Amendment and refused to answer

UNITED STATES DISTRICT COURT
For the Northern District of California

1    questions regarding her relationship with Zhong.  Tr. 66:7-24.

2    47.      On December 7, 2010, Zhong and Chen appeared at the USCIS San Francisco District Office

3    for an interview on Chen's adjustment application, conducted by Officer Condon.  JF&C ¶ 36; Tr.

4    30:25-31:5, 87:9-16.

5    48.      Officer Condon interviewed Zhong and Chen separately, first obtaining address history and

6    marriage history statements from them.  Tr. 31:6-32:5, 89:7-13, 89:21-25.  She first spoke with

7    Zhong, then with Chen.  *Id*.

8    49.      During the interview, Chen executed an affidavit stating:

9            My name is Yue Chen.  I know that Jie was previously married to Nicole.  I know that
             Jie's marriage to Nicole is not real, but a favor.  I have met Nicole.
10

11   JF&C ¶ 42; Ex. 12 at DOJ-000229.[3]

12   50.      Chen also answered a question from Officer Condon about whether Zhong's marriage to

13   Williams was real by writing "I didn't think so, but because of Jie's Business trip of being away from

14   home (about 1-2 days at home per week), now I'm also questioning those business trips, and don't

15   know if it is real or not."  JF&C ¶ 39; Ex. 12 at DOJ-000230.

16   51.      Officer Condon also asked Chen "Have you ever been introduced, or do you know, Nicole

17   Williams?", to which Chen responded "Unknown."  JF&C ¶ 41, Ex. 12 at DOJ-000230.

18   52.      On December 7, 2010, in response to a written question by Officer Condon, Chen provided a

19   list of five previous addresses, noting that since December 2001, she had resided with Zhong.  JF&C

20   ¶ 40; Ex. 12 at DOJ-000230.

21   53.      After Officer Condon interviewed Chen, she asked Chen to leave the room, and again spoke

22   with Zhong.  Tr. 32:6-8, 90:7-13.  At that time, she told Zhong that she had spoken with Williams,

23   and that Williams had confessed that the marriage was fake.  Tr. 32:9-14, 90:9-19.

24   54.      After learning that Officer Condon had spoken with Williams, Zhong wrote and signed an

25

26         [3]  Exhibit 12 was not admitted into evidence.  However, the parties stipulated to the facts

27   contents of the declaration in their Joint Proposed Findings of Fact and Conclusions of Law.  JF&C

28   ¶¶ 35.

1  affidavit stating:

2      My name is Jie Zhong. I never live [sic] with Nicole. My marriage to Nicole is
       always for favor. Steve arranged this marriage. Apparently $25,000 was paid to Steve
3      for the marriage. I don't know/Nicole got how much money for that, and me and
       Nicole never had sex. I always lived with Julia during the marriage with Nicole. I
4      marriaged [sic] to Nicole to get the green card sooner.

5  JF&C ¶ 43; Ex. 13 at DOJ-000224; Tr. 32:18-33:8, 90:22-91:2.

6  55.    Concurrently, Zhong signed a second affidavit pertaining to his asylum claim, stating:

7      My name is Jie Zhong. I previously applied for asylum. My asylum claim was fake. I
       had never been involved with Falun Gong. My father has never been arrested for
8      anything Falun Gong related and my father had never participated Falun Gong [sic]. I
       never gave speech for anything Falun Gong related. I never sent my Falun Gong letter
9      to my dad. . . . Asylum preparer Steve Mao told me to memorize the fake Falun Gong
       story back to year 2000. I don't have any specific religion. I have never been
10     practitioner Falun Gong [sic]. I don't have and never fear China (but I prefer the U.S.)

11  JF&C ¶ 44; Ex. 13 at DOJ-000225; Tr. 33:9-34:16, 91:22-92:10.

12  56.    On December 7, 2010, prior to a break in the adjustment interview, Officer Condon said to

13  Zhong:

14     I'm going to recommend that they take that into consideration. . . I'm just going to see
       what Julia says. Let me grab you a class [sic] of water, let me get her and I just want to
15     advise her. . . to tell her to be truthful, and I'll be right back.

16  JF&C ¶ 37; Tr. 35:21-36:3.

17  57.    After Officer Condon left Zhong and his wife in the room together, Zhong told his wife, in the

18  Mandarin language, the following:

19     She has turned off the video. We only have a few minutes. Because there are only two
       things she wants you to personally say. Ok, fake. The first thing is … it is not true that
20     you are a poor man [unintelligible], she said, but it doesn't matter because I'm already
       a citizen. The first thing is that the marriage to Nicole is fake. Er, just say you have
21     met Nicole. Er, you don't like it, not comfortable, but it is really your business. You
       think that we were faking it.

22

23  JF&C ¶ 38.

24  58.    Zhong did not call Chen as a witness at trial, nor was she available to testify. Tr. 36:7-8,

25  40:11-16.

26  59.    On December 7, 2010, Zhong sent an email message to Officer Condon thanking her for her

27  time. Ex. 15. No one assisted Zhong with drafting the email message in English. Tr. 36:9-21.

28

UNITED STATES DISTRICT COURT
For the Northern District of California

11

UNITED STATES DISTRICT COURT
For the Northern District of California

60.     Subsequently, on March 25, 2011, Officer Condon interviewed Zhong under oath a second time at the USCIS San Francisco District Office.  JF&C ¶ 45; Ex. 14; Tr. 37:4-8, 95:9-12.  The interview was videotaped.  Ex. 14; JF&C ¶ 45.

61.     At the re-interview, Officer Condon read each of Zhong's affidavits to him and asked Zhong whether he had been truthful during his prior interview:

> Condon:      Okay, very good.  So again I just want to get a couple things on record.  I just want to reiterate at your last interview, you were totally truthful with me is that correct?
>
> Zhong:       Yeah, of course.

Ex. 14 at 8:01-8:13; JF&C ¶ 46; Tr. 39:19-21, 96:10-19.

62.     Zhong also confirmed that on December 7, 2010, he had signed a statement attesting that he married Williams to gain lawful permanent residence more quickly.  JF&C ¶ 47; Ex. 13 at DOJ-000224.

63.     During the follow-up interview, Officer Condon read aloud Zhong's prior statement in his December 7, 2010 affidavit stating: "I always lived with Julia during the marriage with Nicole, I'm married to Nicole to get the green card sooner."  JF&C ¶ 47; Ex. 14 at 8:45-9:35.  She then asked "Is that truthful?"  JF&C ¶ 47; Ex. 14 at 8:45-9:35.  Zhong did not provide an audible response, but nodded his head.  JF&C ¶ 47; Ex. 14 at 8:45-9:35.

64.     During the interview, Zhong also confirmed that on December 7, 2010, he signed a statement attesting that neither he nor his father had ever practiced Falun Gong.  JF&C ¶ 48; Tr. 39:19-21; Ex. 13 at DOJ-000225; Ex. 14 at 9:35-10:35.

65.     At the re-interview, Zhong told Officer Condon that he did not really join Falun Gong.  Tr. 29:21-23; Ex. 14 at 25:15-25:58.

66.     On May 23, 2011, Zhong emailed Officer Condon to inquire about the status of his wife's application.  JF&C ¶ 49; Ex. 17 at DOJ-000410-11; Tr. 38:6-25.

67.     After Officer Condon concluded her investigation, she referred the case to ICE, where it was assigned to Agent Burke for review.  Tr. 97:4-10, 116:13-25.

68.     Agent Burke reviewed Zhong's alien file, reviewed the DVD of Officer Condon's March 25,

1   2011 interview, and composed his findings in a Report of Investigation.  Tr. 116:19-23.  Based upon

2   the Report, Agent Burke prepared the Affidavit of Good Cause.  Tr. 116:24-25; Dkt. No. 9.

## IV.   LEGAL STANDARDS

**A.   Revocation of Naturalization**

5       Pursuant to 8 U.S.C. § 1451(a), upon a showing of good cause, the Government may institute

6   proceedings to revoke and set aside the order admitting a naturalized citizen to citizenship and

7   canceling the certificate of naturalization "on the ground that such order and certificate of

8   naturalization were illegally procured or were procured by concealment of a material fact or by

9   willful misrepresentation . . . ."

10      In a denaturalization proceeding, the Government bears the "heavy burden" of providing

11   "clear, unequivocal, and convincing" evidence that citizenship should be revoked.  *United States v.*

12   *Dang*, 488 F.3d 1135, 1139 (9th Cir. 2007) (quoting *Fedorenko v. United States*, 449 U.S. 490, 505

13   (1981)).  The Government's evidence justifying denaturalization must "not leave the issue in doubt."

14   *Id.* (quoting *Fedorenko*, 449 U.S. at 505).  The government bears the burden of such a high degree of

15   proof in denaturalization proceedings because of the "importance of the right that is at stake."  *United*

16   *States v. Arango*, 670 F.3d 988, 992 (9th Cir. 2012) (quoting *Fedorenko*, 449 U.S. at 505-06).  Once a

17   court determines that the government has met its burden of proving that a naturalized citizen obtained

18   his citizenship illegally, or by concealing a material fact or through willful misrepresentation, it has

19   no discretion to excuse the conduct and must enter a judgment of denatuarlization.  *Fedorenko*, 449

20   U.S. at 517.

**B.   Eligibility for Naturalization and Illegal Procurement**

22      To be eligible for naturalization, a person must: (1) have been lawfully admitted to the United

23   States for permanent residence; (2) be a person of good moral character for at least five years before

24   applying for naturalization; and (3) have resided continuously and have been physically present in the

25   United States for the required statutory period.  8 U.S.C. §§ 1427, 1429.  A person must strictly

26   comply with all of the congressionally-mandated requirements for naturalization; noncompliance

27   with these prerequisites results in the illegal procurement of naturalization and subjects the person to

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

13

1   denaturalization proceedings under 8 U.S.C. § 1451(a).  *United States v. Szehinskyj*, 277 F.3d 331,

2   334 (3d Cir. 2002) (citations omitted); *United States v. Nunez-Garcia*, 262 F. Supp. 2d 1073, 1080

3   (C.D. Cal. 2003).

4   **C.      Lawfully Admitted**

5          1.      Lawful Permanent Resident

6          To qualify for naturalization, an applicant must establish that he was lawfully admitted to the

7   United States as a permanent resident in accordance with all applicable provisions of the INA.  8

8   U.S.C. § 1429; *see also* 8 U.S.C. § 1427(a)(1).  Whether an alien is "lawfully" admitted for

9   permanent residence is an issue of law.  *Monet v. INS*, 791 F.2d 752, 753 (9th Cir. 1986).  The INA

10  defines the term "lawfully admitted for permanent residence" to mean "the status of having been

11  lawfully accorded the privilege of residing permanently in the United States as an immigrant in

12  accordance with the immigration laws, such status not having changed."  8 U.S.C. § 1101(a)(20).

13         Courts have consistently held that those who have gained their permanent resident status in an

14  unlawful manner – and who were ineligible for such status – were not "lawfully admitted for

15  permanent residence" within the meaning of the immigration laws.  *Kyong Ho Shin v. Holder*, 607

16  F.3d 1213, 1217 (9th Cir. 2010) (noting that the holdings in prior decisions broadly deem all grants of

17  lawful permanent resident status that were not in substantive compliance with the immigration laws

18  to be void *ab initio*.); *Monet*, 791 F.2d at 753-54 (holding that an alien who became a lawful

19  permanent resident in error was not eligible for a waiver of deportation because he was not "lawfully"

20  admitted for permanent residence); *Lai Haw Wong v. INS*, 474 F.2d 739, 741-42 (9th Cir. 1973)

21  (affirming Board of Immigration Appeals decision that aliens who were admitted for permanent

22  residence in error on visas for which they were not eligible were not conferred a "lawful" status and

23  were not "lawfully admitted for permanent residence"); *In re Koloamatangi*, 23 I. & N. Dec. 548, 549

24  (BIA 2003) (holding individual who obtained permanent resident status based on a bigamous

25  marriage was not "lawfully admitted for permanent residence" and could not qualify for cancellation

26  of removal under 8 U.S.C. § 1229(b)(a)).

27         The Ninth Circuit has held that the term "lawfully" connotes compliance with "'substantive

28

14

**UNITED STATES DISTRICT COURT**
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1  legal requirements, not mere procedural regularity.'" *Monet*, 791 F.2d at 753 (quoting *In re*

2  *Longstaff*, 716 F.2d 1439, 1441 (5th Cir. 1983)).

3       An alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has

4  sought to procure or has procured) a visa, other documentation, or admission into the United States or

5  other benefit provided under the INA is inadmissible.  8 U.S.C. § 1182(a)(6)(C)(i).

## V.   ANALYSIS AND CONCLUSIONS OF LAW

### A.   Whether Zhong's Affidavits Were the Result of Coercion

8       As a threshold matter, Zhong seeks to exclude the affidavits he executed during the December

9  7, 2010 interview with Officer Condon wherein he confessed to asylum and marriage fraud on the

10  ground that Officer Condon coerced him into making such statements.  Def. Br. at 11-14.  The

11  Government maintains that Zhong has failed to establish that the affidavits were the result of

12  coercion.  The Court agrees with the Government.

13       A defendant has the burden of establishing coercion or duress by a preponderance of the

14  evidence.  *United States v. Solorzano-Rivera*, 368 F.3d 1073, 1081 (9th Cir. 2004).  The test to

15  determine whether a statement is involuntary is "whether, considering the totality of the

16  circumstances, the government obtained by physical or psychological coercion or by improper

17  inducement so that the suspect's will was overborne."  *United States v. Leon Guerrero*, 847 F.2d

18  1363, 1366 (9th Cir. 1988) (citing *Haynes v. Washington*, 373 U.S. 503, 513-14 (1963)).

19       As indicated above, on December 7, 2010, Zhong and Chen appeared at the USCIS San

20  Francisco District Office for an interview by Officer Condon on Chen's adjustment application.

21       During the interview, Zhong drafted and signed an affidavit stating:

22       My name is Jie Zhong.  I never live [sic] with Nicole.  My marriage to Nicole is
         always for favor.  Steve arranged this marriage.  Apparently $25,000 was paid to Steve
23       for the marriage.  I don't know/Nicole got how much money for that, and me and
         Nicole never had sex.  I always lived with Julia during the marriage with Nicole.  I
24       married [sic] to Nicole to get the green card sooner.

25  Ex. 13 at DOJ-000224; JF&C ¶ 43.

26       He drafted and signed a second affidavit stating:

27       My name is Jie Zhong.  I previously applied for asylum.  My asylum claim was fake.  I
         had never been involved with Falun Gong.  My father has never been arrested for
28

15

anything Falun Gong related and my father had never participated Falun Gong [sic]. I never gave speech for anything Falun Gong related. I never sent my Falun Gong letter to my dad. . . . Asylum preparer Steve Mao told me to memorize the fake Falun Gong story back to year 2000. I don't have any specific religion. I have never been practitioner Falun Gong [sic]. I don't have and never fear China (but I prefer the U.S.)

JF&C ¶ 44; Ex. 13 at DOJ-000225.

During the interview, Chen also executed an affidavit stating:

My name in Yue Chen. I know that Jie was previously married to Nicole. I know that Jie's marriage to Nicole is not real, but a favor. I have met Nicole.

JF&C ¶ 42; Ex. 12 at DOJ-000229.

Thereafter, on March 25, 2011, Officer Condon interviewed Zhong under oath a second time at the USCIS San Francisco District Office. JF&C ¶ 45; Ex. 14. At that time, she asked Zhong whether he had been truthful during his prior interview and he responsed that he had. JF&C ¶ 46; Ex. 14 at 8:01-8:13. Zhong also confirmed that on December 7, 2010, he signed the affidavits attesting that he married Williams to gain lawful permanent residence more quickly and that neither he nor his father had ever practiced Falun Gong. JF&C ¶¶ 47, 48.

Zhong contends that the December 7, 2010 affidavits were the result of coercion by Officer Condon. He argues:

[T]he evidence shows that Officer Condon coerced Zhong into writing and signing the affidavit stating that his asylum application was fraudulent. Specifically, Zhong maintains that during the December 7, 2010 interview with Officer Condon, after he stated in writing that his marriage to Williams was real, Plt's Ex. 13, the officer told him that if he kept saying that his second marriage was real, she was going to take away his citizenship. Tr. at 48:22-23. Officer Condon then assured Zhong that if he said his asylum claim and second marriage were fake, everything would be all right with Chen's application for lawful permanent resident status. Tr. at 48:24-49:2-3. At that point, Zhong maintains that because of the way Officer Condon said these things, he believed that what he was saying – that is, drafting his affidavits – "was just to help her." Tr. at 49:4-5.

Officer Condon's threat to revoke Zhong's citizenship if he did not "cooperate" was by no means slight. Indeed, in light of all the attendant circumstances, it is clear that the threat was sufficiently compelling to overbear his will, which resulted in the involuntary statements extracted by Officer Condon regarding his asylum application and, as discussed below, his marriage to Williams. These circumstances included not only the threat of losing his citizenship, which would affect the pending adjustment of status application of his wife, Chen, but also the lawful permanent resident status of his parents, who were admitted to the U.S. based on his respective I-130 visa petitions filed on their behalf as immediate relatives. Of course, his native-born U.S. citizen minor children of the marriage to

16

1    Chen may also be affected if he is ultimately removed from the U.S.

2   Def. Br. at 13.

3         Zhong further argues:

4            [L]ike his asylum affidavit . . . the marriage affidavit was also obtained by
      Officer Condon through coercion – that is, he said and wrote what he thought would
5     "please" the officer, because he feared losing his citizenship if he did not. *See* Tr. at
      39:1-12. [ . . . .]
6
             In particular, Zhong first told Officer Condon during the December 7, 2010
7     interview that his marriage to Williams was real and memorialized that fact in writing.
      Tr. at 41:12-15 and Plt's Ex. 13, DOJ 000227-28 (stating, among other things, that his
8     marriage to Williams was real and that it was consummated.)  The officer then told
      him that if he kept saying that his marriage to Williams was real, she was going to take
9     away his citizenship. Tr. at 48:22-23.  Officer Condon assured him that if he said his
      asylum claim and marriage to Williams were fake, everything would be all right with
10    Chen's application for a green card. Tr. at 48:24-49:2-3.  In short, Officer Condon
      used the stick of denaturalization and dangled the carrot of a green card for Zhong's
11    wife to induce his involuntary statements.

12   Def. Br. at 15-16.

13        The Court, however, is unpersuaded.  Although Zhong testified that Officer Condon

14   threatened him and suggested that if he confessed to marriage fraud, she would assist him with

15   Chen's application, the Court finds Zhong's testimony lacks credibility.  At trial, Officer Condon

16   testified about the circumstances and standard protocol surrounding the December 7, 2010 interview.

17   Tr. 87:9-94:23.  There was nothing intimidating about the interview environment or how Officer

18   Condon conducted it.  Particularly, Officer Condon testified that she never told Zhong that if he

19   confessed to fraud in either his marriage to Williams or with respect to his claim that he practiced

20   Falun Gong, she would help him with Chen's case. Tr. 92:11-15, 97:11-13.  She further denied

21   Zhong's accusation that she threatened that if he did not confess, she would take away his citizenship.

22   Tr. 97:14-18.  Condon also testified that she did not tell Zhong what to write in his affidavit, but

23   simply posed questions to him. Tr. 97:19-22.  She testified that Zhong wrote the statements in the

24   affidavits after he confessed to engaging in fraud. Tr. 99:20-24.

25        Zhong appeared before Officer Condon for a second interview in March 2011, at which time

26   Officer Condon reviewed the statements in the affidavits Zhong executed and his oral testimony from

27   the December 2010 interview. Tr. 95:9-17.  At this time, rather than disavow or contest those

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

17

statements, Zhong affirmed that his marriage to Williams was fraudulent.  Tr. 95:9-96:19.  Officer

Condon testified that at the March 2011 interview, Zhong did not appear nervous or uncomfortable.

Tr. 96:20-25.  The videotape of the March 2011 interview supports Officer Condon's description.

Throughout the interview, Zhong appears relaxed and his exchanges with Officer Condon are

conversational in nature.  Ex. 14.  If Zhong felt coerced during the December 2010 interview, he had

the opportunity during the March 2011 second interview to retract or correct his prior statements, yet

made no attempt to do so.

Looking at the totality of the circumstances, the Court finds that Zhong has failed to

demonstrate that the statements made in his December 2010 affidavits were the result of coercion.

The Court finds Officer Condon's testimony that she did not threaten Zhong or suggest that if he

stated his marriage was a sham, she would assist him with Chen application, to be credible.  Further,

Zhong had the opportunity to raise any objection to the accuracy or authenticity of his admissions

during the March 2011 interview, but did not.  Overall, the record bears no evidence of coercive

conduct by Officer Condon leading to Zhong's admissions.

Zhong also contends that the Court should consider his cultural background when assessing

whether he was coerced into making the statements in his affidavits.  Def. Br. at 13.  Zhong submits

that "because [he] is from China, his experiences in growing up in an authoritarian society inform his

contacts with government officials."  *Id.*  During trial Zhong testified that, "In China . . . when a

government official or police officer asks you a question, if you go against them, you will be

punished even more severely."  Tr. 48:2-4.  Thus, Zhong submits that against this cultural backdrop,

he believed that he had to comply with Officer Condon's directives or he would face consequences,

including having his citizenship taken away and Chen's application denied.  Def. Br. at 14.  The

Court is unpersuaded by Zhong's proffered explanation.  Even accepting that Zhong may have

experienced coercive tactics by Chinese officials, he has lived in the United States since 1999, and

has had constant interaction with the American immigration system.  His testimony that government

officials in China often exert pressure on citizens, without more, is insufficient to establish that his

statements before Officer Condon were the result of coercion.  Moroever, Zhong is a businessman

1    who has attended college and studied electrical engineering.  He is thus sophisticated and well-

2    educated and could have voiced any objection to alleged threats by Officer Condon during the

3    interview or anytime thereafter.

4           In sum, the Court finds that Zhong has failed to establish that the affidavits he executed on

5    December 7, 2010 were the result of coercion.  The Court therefore rejects Zhong's request to

6    exclude them from consideration.

7           Zhong also argues that the Court should exclude Williams' November 4, 2010 affidavit

8    wherein she indicated that she married Zhong "as a favor and to get a little money," because it also

9    the result of coercion by Officer Condon. Def. Br. at 16.  Zhong argues that at trial, Williams

10   disavowed the affidavit when she testified that Officer Condon told her to write the statement.  Tr.

11   67:21-68:4.  Zhong advances that, "Williams' testimony that Officer Condon told her what to write in

12   the affidavit raises the reasonable inference that she feared Officer Condon, or at least did not trust

13   the officer, and is thus evidence of coercion.  In turn, this evidence of fear, lack of trust and coercion

14   raises serious doubts over the veracity and reliability of Williams' affidavit." Def. Br. at 16-17.  The

15   Court, however, sees no evidence demonstrating that Williams executed the affidavit as a result of

16   coercion by Officer Condon.  The Court therefore rejects Zhong's request to exclude Williams'

17   November 4, 2010 affidavit.

18          When called as a witness at trial, Williams invoked her Fifth Amendment right and refused to

19   answer any questions regarding her relationship with Zhong.  The Government argues that the Court

20   should draw an adverse inference against Zhong as a result of Williams' invocation of her Fifth

21   Amendment rights and refusal to testify. Gov. Br. at 4-5.  The Government asserts that, in addition to

22   the arguments it previously raised in its Motion in Limine No. 2 (Dkt. No. 42), "the basis to draw the

23   adverse inference is even stronger here, where Williams's answers could not possibly incriminate her

24   unless her marriage to Zhong was fraudulent." Gov. Br. at 4.  In his opposition brief to the

25   Government's Motion in Limine No. 2, Zhong argued that the Government has failed to cite any

26   authority from this Circuit adopting the rule in a similar factual or procedural context. *See* Zhong

27   Opp. at 2-3, Dkt. No. 51.  He also argued that he does not control Williams and her decision to assert

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

UNITED STATES DISTRICT COURT
For the Northern District of California

1  her Fifth Amendment privilege is a personal right for which he should not be sanctioned. *Id*. at 3-4.

2  The Court agrees with Zhong and declines the Government's request to draw an adverse inference

3  against him based on Williams' invocation of her Fifth Amendment privilege.

4       Having resolved these preliminary issues, the Court turns to the Government's claims for

5  revocation of Zhong's citizenship.

6  **B.    Claims for Denaturalization**

7       The Government argues that it established three grounds to revoke Zhong's citizenship: (1)

8  Zhong never obtained lawful permanent resident status; (2) Zhong lacked good moral character at the

9  time of his naturalization; and (3) Zhong procured naturalization through concealment or willful

10  misrepresentation. Gov. Br. at 7. The Court will examine each basis in turn.

11       1.    Lawful Permanent Resident Status

12       The Government first argues that Zhong illegally procured his naturalization because he

13  gained his lawful permanent resident status in an unlawful manner. Gov. Br. at 7. Specifically, the

14  Government contends that by the date Zhong adjusted his asylum status, he had engaged in marriage

15  fraud by marrying Williams for the purpose of obtaining his immigration benefit. *Id*. at 8. It further

16  argues that Zhong illegally procured naturalization because he fraudulently obtained his asylum

17  status, and then his LPR status, by representing that he was affiliated with Falun Gong and feared

18  persecution based on such involvement. *Id*. at 9-10.

19       *a.    Legal Standard*

20       An asylee may apply for adjustment of status to that of lawful permanent resident pursuant to

21  8 U.S.C. § 1159 if the applicant has been physically present in the United States for at least one year

22  after having been granted asylum. 8 U.S.C. § 1159(b)(2). An alien who seeks to adjust status under

23  8 U.S.C. § 1159 must be admissible as an immigrant. 8 U.S.C. § 1159(b)(5). Admissibility is

24  defined in the negative, and Congress has set forth the categories of inadmissible aliens in 8 U.S.C. §

25  1182. Particularly, 8 U.S.C. § 1182(a)(6)(C) renders inadmissible any alien who "by fraud of willful

26  misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa,

27  other documentation, or admission into the United States or other benefit provided under this

28

20

1   chapter[.]

2      An alien who was inadmissible on the date he adjusted his status does not obtain lawful

3   permanent resident status.  *Shin v. Holder*, 607 F.3d 1213, 1217 (9th Cir. 2010).  Thus, the Ninth

4   Circuit has held that, "all grants of LPR status that were not in substantive compliance with the

5   immigration laws to be void ab initio."  *Id.* (citing *Monet*, 791 F.2d at 753, and *Koloamatangi*, 23

6   I&N Dec. at 550).  Thus, the question here is whether Zhong was inadmissible at the time USCIS

7   granted his first adjustment application which changed his status from asylee to LPR, effective

8   February 2, 2005.

9              *b.      Marriage Fraud*

10     The Government argues that Zhong was inadmissible because his marriage to Williams was

11  fraudulent.  Gov. Br. at 8-9.  It contends that Zhong married Williams so that he could become a LPR

12  faster than if he waited for USCIS to process his original application based on his asylee status.

13  Zhong, however, maintains that his marriage to Williams was legitimate.  Reviewing the evidence

14  adduced at trial, the Court finds that the Government has met its burden of proving that Zhong's

15  marriage to Williams was fraudulent and done for the purpose of adjusting his status to LPR.

16     The Ninth Circuit has held that to decide whether a marriage is entered for the purpose of

17  procuring an immigration benefit, the focus of the inquiry is whether the couple "intended to establish

18  a life together at the time they were married."  *Nakamoto v. Ashcroft*, 363 F.3d 874, 882 (9th Cir.

19  2004).  Here, the evidence demonstrates that Zhong and Williams did not have such an intention.

20     At trial, Zhong testified that before he married Williams, he knew that he could get a green

21  card based on his marriage to a United States citizen and that it was faster to get a green card based

22  on marriage to a citizen than to get a green card based on asylum.  Tr. 12:20-13:1.  At the time that

23  Zhong married Williams, he had been waiting for more than four years for USCIS to process his first

24  adjustment application.  He divorced Chen on July 5, 2005 and married Williams less than a month

25  later on August 4, 2005.  Exs. 3, 4.  He testified that he knew Williams approximately two or three

26  months before they were married.  Tr. 43:4-5.  At the time he married Williams, he was still living

27  with Chen at 1009 Craftsman Drive, in Hercules, California.  Tr. 14:12-14.  Although Williams'

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

21

UNITED STATES DISTRICT COURT
For the Northern District of California

1  Affidavit in Support of Zhong's second adjustment application lists her address as 1009 Craftsman

2  Drive, Zhong testified that Williams never lived at that address. Tr. 13:25-14:11. Rather, he and

3  Chen have lived together at that addressed since 2001. Tr. 14:12-14. Zhong and Chen also had their

4  second child in August 2007 – approximately seven months after Zhong's divorce from Williams'

5  was finalized. Tr. 15:23-16:2. The only evidence that Zhong offered suggesting that he intended to

6  establish a life together with Williams was that he would spend the night with her at her Oakland

7  apartment on Thursdays and Fridays. Tr. 44:16-22. Zhong did not produce any objective evidence

8  demonstrating that he and Williams entered into the marriage with an intent to establish a life

9  together, such as income tax forms or bank accounts, rental agreements, testimony or other evidence

10  of their courtship, or a wedding ceremony. *See Nakamoto*, 363 F.3d at 882. Notably, Zhong testified

11  that after his marriage to Williams, he and Chen continued to file joint tax returns and that his parents

12  did not know that he and Chen divorced. Tr. at 23:24-24:1, 14:15-17.

13      Further, as set forth above, during his December 7, 2010 interview, Zhong executed an

14  affidavit wherein he conceded that his marriage to Williams was a "favor" for which Williams was

15  paid; that he and Williams never had sex; that he lived with Chen during his marriage to Williams;

16  and that he married Williams to get a green card sooner. Ex. 13 at DOJ-000224. Zhong affirmed

17  these statements during his March 2011 interview. Tr. 95:9-96:19. Moreover, as detailed above,

18  both Chen and Williams' signed affidavits also indicating that Zhong's marriage to Williams was a

19  sham. Exs. 11, 12.

20      Based on the foregoing testimony and documentary evidence, the Court finds that the

21  Government has established by clear, convincing, and unequivocal evidence that Zhong and Williams

22  did not intend to establish a life together at the time they were married.[4] By his own admission,

23  _____

24      [4] In his Closing Brief, Zhong argues that Officer Condon's investigation into marriage fraud
   was "fundamentally flawed" because she considered Zhong and Williams' race as one of the indicia

25  of fraud. Def. Br. at 17. He asserts that "DHS's use of racial profiling in this marriage fraud
   investigation fundamentally compromises the government's case." *Id*. The Court has considered

26  this argument and finds that Zhong has failed to cite any authority indicating that this consideration
   is sufficient to override the other evidence establishing his marriage to Williams was fraudulent.

27  Stated another way, there is ample evidence in the record supporting the Government's charge that

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Zhong stated that the marriage was arranged and done as a favor so he could change his status sooner.

2    Further, Zhong's admission, along with the evidence outlined above, overwhelmingly demonstrates

3    that Zhong continued his life with Chen throughout the time he was married to Williams.  Thus, the

4    Court finds that Zhong's marriage to Williams was fraudulent and was done for the purpose of

5    obtaining an immigration benefit, thereby rending him inadmissible under 8 U.S.C. § 1182(a)(6)(C).

6    *See Aslam v. Mukasey*, 537 F.3d 110, 116-17 (2d Cir. 2008).  Because he was inadmissible at the time

7    USCIS granted his first adjustment application, Zhong never obtained LPR status.  Because Zhong

8    was not lawfully admitted for permanent residence, he was not eligible to naturalize.  8 U.S.C. §

9    1429.  Accordingly, Zhong's naturalization was illegally procured and must be revoked.  8 U.S.C. §

10   1451(a).

11                    *c.      Asylum Status*

12          The Government next argues that Zhong illegally procured naturalization because he

13   committed asylum fraud, and thus his status was not lawfully adjusted.  Gov. Br. at 9.

14          In order to be eligible for asylee status, an applicant must establish that he is a "refugee"

15   within the meaning of 8 U.S.C. § 1101(a)(42).  8 U.S.C. § 1158(b)(1)(A).  Pursuant to 8 U.S.C. §

16   1101(a)(42)(A), a refugee is

17          any person who is outside any country of such person's nationality or, in the case of a
             person having no nationality, is outside any country in which such person last
18          habitually resided, and who is unable or unwilling to return to, and is unable or
             unwilling to avail himself or herself of the protection of, that country because of
19          persecution or a well-founded fear of persecution on account of race, religion,
             nationality, membership in a particular social group, or political opinion.

20

21          The Government contends that when Zhong applied for asylum status on May 9, 2000, he

22   based his claim on his alleged fear of persecution in China relating to his and his father's practice of

23   Falun Gong.  Ex. 1.  The Government argues that this representation was revealed to be fraudulent

24   when Zhong executed the affidavit on December 7, 2010, expressly stating that his "asylum claim

25   was fake."  Ex. 13 at DOJ-000225.  In that affidavit, Zhong admitted that he "had never been

26   ────────────────────

27   Zhong's marriage is fraudulent; thus the Court need not consider whether Officer Condon
     improperly considered Zhong and Williams' racial background during her investigation.
28

involved with Falun Gong," that his "father has never been arrested for anything Falun Gong related and . . . had never participated [in] Falun Gong," and that his "[a]sylum preparer Steve Mao told [him] to memorize the fake Falun Gong story back to year 2000." *Id*. Zhong also stated in that affidavit: "I don't now and never fear China (but I prefer the U.S.)." *Id*. Thereafter, at the re-interview before Officer Condon on March 25, 2011, she asked Zhong whether his December 7, 2010 statements were true, Zhong responded, "yes, of course," and confirmed that neither he nor his father ever practiced Falun Gong. Ex. 14 at 8:00.

The Government argues that because Zhong repeatedly admitted that he was never persecuted in China and did not fear persecution, he was never a refugee within the meaning of 8 U.S.C. § 1101(a)(42) and was ineligible to obtain lawful permanent resident status pursuant to 8 U.S.C. § 1159(b)(3). Gov. Br. at 9-10. It thus argues that Zhong was not a lawful permanent resident when he applied to become a citizen and his naturalization must be revoked under 8 U.S.C. § 1451(a).

Zhong, however, maintains that USCIS properly granted him asylum on June 26, 2000 based on his practice of Falun Gong. Def. Br. at 8. He argues that before he filed his Form I-589 Application for Asylum, and before he entered the United States in February 1999, he practiced Falun Gong. *Id*. at 8-9. In support he cites his declaration supporting his Form I-589 Application wherein he recounts his and his father's involvement in Falun Gong. *Id*. at 9. Zhong further argues that, as he explained during his March 25, 2011 re-interview, even if he did not actually "join" Falun Gong, he practiced it and thus "from the outside people see in, that looks like I really join it." *Id*. at 10 (citing Ex. 14 at 25:55). Thus, Zhong argues that because the Chinese government would perceive that he was associated with Falun Gong, he qualified as an asylee.

After carefully considering the evidence and witness testimony, the Court agrees with the Government that because Zhong's claim that he practiced Falun Gong was false, he did not lawfully procure asylum. *Shin*, 607 F.3d at 1217; *Monet*, 791 F.2d at 753. While Zhong maintains that he practiced Falun Gong or was at least involved with Falun Gong enough to be perceived as a Falun Gong practitioner, the Court finds Zhong's statements made in connection with his asylum application and his testimony regarding those statements lack credibility. At the December 7, 2010

24

interview, Zhong confessed that his asylum claim was fake and that he had never been involved with Falun Gong.  He then reaffirmed those statements during the re-interview on March 25, 2011.  While Zhong argues that the affidavits – and thus his statements about Falun Gong – were the result of coercion by Officer Condon, the Court has rejected this argument.  Moreover, as the Government points out, despite his representation that he fears persecution in China, Zhong has traveled to China four times since 2006.  Ex. 9 at 4.  Thus, the Court finds that Zhong's permanent resident status was illegally procured because it was based on his fraudulently-obtained asylum status.  Accordingly, because Zhong never obtained lawful permanent resident status, his naturalization was illegally procured and must be set aside.  8 U.S.C. § 1451(a); *Fedorenko*, 449 U.S. at 506.

> ### 2.   <u>Good Moral Character</u>

The Government next asserts that Zhong illegally procured naturalization because he lacked the good moral character required to naturalize.  Gov. Br. at 10.  "In order lawfully to obtain U.S. citizenship, a person must be of 'good moral character' for the five years immediately preceding the date of filing her citizenship application, as well as from the date of filing this application until the date she or he is admitted to citizenship."  *Dang*, 488 F.3d at 1139; 8 U.S.C. § 1427(a)(3).  Here, Zhong filed his naturalization application on November 5, 2009.  JSUF ¶ 23; Condon Decl., Ex. K.  Thus, Zhong was required to establish that he was a person of good moral character from November 4, 2004, through March 10, 2010.

"Under 8 U.S.C. § 1101(f), a person shall not 'be regarded as, or found to be, a person of good moral character' if, within the statutory period, he or she fell into any of the seven enumerated categories."  *Dang*, 488 F.3d at 1139.  Under 8 U.S.C. § 1101(f)(6), "No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was . . . one who has given false testimony for the purpose of obtaining any benefits under this chapter[.]"  Section 1101(f)(6) does not include a materiality requirement for false testimony, *Kungys v. United States*, 485 U.S. 759, 779 (1988), but "'testimony' is limited to oral statements made under oath" and must have been given "with the subjective intent of obtaining immigration benefits."  *Id.* at 780; *Ramos v. INS*, 246 F.3d 1264, 1266

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

25

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1 | (9th Cir. 2001). False testimony includes false statements made orally under oath during a

2 | naturalization interview. *Ramos*, 246 F.3d at 1265 (citing *Bernal v. INS*, 154 F.3d 1020, 1023 (9th

3 | Cir. 1998)).

4 | Here, the Government argues that the evidence establishes that Zhong provided false

5 | testimony to obtain his citizenship and thus cannot establish that he possessed the good moral

6 | character required for naturalization. Gov. Br. at 10. The Court agrees.

7 | On January 22, 2010, Zhong testified under oath at his naturalization interview that he

8 | practiced Falun Gong and that he feared return to China. Ex. 9. However, on December 7, 2010, and

9 | on March 25, 2011, Zhong admitted that his asylum claim was fraudulent and that neither he nor his

10 | father ever participated in Falun Gong or were persecuted for doing so, and that he did not fear

11 | returning to China. Exs. 13 at DOJ-000225, 14 at 25:15-26:00. Zhong also falsely testified that he

12 | had never given false or misleading information to any U.S. Government official while applying for

13 | an immigration benefit. Ex. 9 at 8. Because Zhong provided this false oral testimony under oath and

14 | during the statutory period to obtain an immigration benefit, he did not possess the good moral

15 | character required to naturalize. 8 U.S.C. § 1101(f)(6). Consequently, his naturalization must be

16 | revoked. 8 U.S.C. § 1451(a).

17 |         3.    <u>Concealment of a Material Fact or Willful Misrepresentation</u>

18 | Finally, the Government asserts that Zhong's naturalization must be revoked because he

19 | procured it by concealment or willful misrepresentation of material facts. Gov. Br. at 10.

20 | Section 1451(a) permits the Government to revoke citizenship if naturalization was "procured

21 | by concealment of a material fact or by willful misrepresentation." *See Arango*, 670 F.3d at 992-93.

22 | This ground for denaturalization contains four independent requirements: (1) the naturalized citizen

23 | must have misrepresented or concealed some fact; (2) the misrepresentation or concealment must

24 | have been willful; (3) the fact must have been material; and (4) the naturalized citizen must have

25 | procured citizenship as a result of the misrepresentation or concealment." *Kungys*, 485 U.S. at 767.

26 | Although the term "willful" is not defined in the denaturalization statute, the Ninth Circuit has

27 | held that an alien who seeks to obtain immigration status by misrepresenting a material fact has done

28 |

26

UNITED STATES DISTRICT COURT
For the Northern District of California

1    so "willfully" if the misrepresentation was "deliberate and voluntary," even if the Government has

2    not demonstrated an intent to deceive the government.  *Arango*, 670 F.3d at 994-95 (citing *Espinoza-*

3    *Espinoza v. INS*, 554 F.2d 921, 925 (9th Cir. 1977)).

4         The test of whether concealments or misrepresentations were material under 8 U.S.C. §

5    1451(a) is whether they had a natural tendency to influence the decision of the USCIS.  *Kungys*, 485

6    U.S. at 72.  This test must be met by evidence that is clear, unequivocal, and convincing.  *Id*.  The

7    Ninth Circuit has applied a heightened materiality requirement in the context of denaturalization and

8    held that the Government must also produce sufficient evidence to raise a fair inference that the

9    applicant was ineligible.  *United States v. Puerta*, 982 F.2d 1297, 1303-04 (9th Cir. 1992).

10        A misrepresentation "procures citizenship" when, if disclosed, the misrepresented or

11   concealed information would have resulted in the denial of an applicant's naturalization application.

12   *See Kungys*, 485 U.S. at 773.

13        In this case, Part 10, question 23 of Zhong's naturalization application asked, "Have you ever

14   given false or misleading information to any U.S. Government official while applying for any

15   immigration benefit or to prevent deportation, exclusion, or removal?"  Ex. 9 at 8.  In response,

16   Zhong checked the box indicating "No."  *Id*.  He then orally affirmed that response at his

17   naturalization interview in January 2010 before Officer Alefosio.  *Id*.  The Court finds that the

18   Government has proven that Zhong's representation meets all four criteria identified above.  Zhong

19   deliberately and voluntarily concealed that he had committed asylum fraud.  This concealment was

20   material, in that it had a natural tendency to influence USCIS's decision because had the truth been

21   disclosed, Zhong would have been precluded from demonstrating that he was lawfully admitted as a

22   permanent resident, 8 U.S.C. § 1101(a)(42), and from showing that he was a person of good moral

23   character under 8 U.S.C. § 1101(f).  The concealment thus procured citizenship because, if disclosed,

24   the information would have resulted in the USCIS denying Zhong's naturalization application.

25   Accordingly, Zhong's naturalization is subject to revocation pursuant to 8 U.S.C. § 1451(a).

26

27

28

27

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VI.   CONCLUSION

In sum, for the reasons set forth above, the Court finds that the Government has met its burden of establishing that revocation of Zhong's naturalization is warranted pursuant to 8 U.S.C. § 1451(a).

As to Count One, the Government has established that Zhong was never a refugee within the meaning of 8 U.S.C. § 1101(a)(42), and therefore obtained his asylum status and his LPR status fraudulently.  Because he was not lawfully admitted to the United States, he was ineligible to naturalize and thus his naturalization was illegally procured and must be revoked as provided in 8 U.S.C. § 1451(a).  The Government is therefore entitled to judgment on Count One.

As to Count Two, the Government established that Zhong was not lawfully admitted to the United States based on his asylum fraud and fraudulent marriage to Williams.  Because he was not eligible for naturalization, his naturalization was illegally procured and must be revoked pursuant to 8 U.S.C. § 1451(a).  The Government is therefore entitled to judgment on Count Two.

With respect to Count Three, the Government established that because Zhong provided false testimony to obtain his citizenship, he cannot demonstrate the good moral character required for naturalization under 8 U.S.C. § 1427(a).  The Government is therefore entitled to judgment on Count Three.

Finally, as to Count Four, the Government has established that Zhong's naturalization must be revoked because he concealed the fact that he committed asylum fraud, which would have precluded him from naturalizing.  8 U.S.C. § 1451(a).  The Government is therefore entitled to judgment on Count Four.

Accordingly, because the Government has demonstrated by clear, unequivocal and convincing evidence that Zhong illegally procured his citizenship, lacked the good moral character required to naturalize, and procured his naturalization through willful misrepresentation and concealment of a material fact, **IT IS HEREBY ORDERED** that the naturalization of Zhong ordered by the Attorney General of the United States, admitting Zhong to United States citizenship, is **REVOKED** and **SET ASIDE**.  Certificate of Naturalization No. 78371054 is hereby **CANCELED**.  Zhong is forever

UNITED STATES DISTRICT COURT
For the Northern District of California

1  restrained and enjoined from claiming any rights, privileges, or advantages under any document

2  which evidences United States citizenship obtained as a result of Zhong's March 10, 2010

3  naturalization.

4  **IT IS FURTHER ORDERED** that Zhong surrender and deliver his Certificate of

5  Naturalization, and any copies thereof in his possession (and to make good faith efforts to recover

6  and then surrender any copies thereof that he knows are in the possession of others), to the Secretary

7  of the Department of Homeland Security, or her designated representative, and return any other

8  indicia of United States citizenship, and any copies thereof in his possession (and to make good faith

9  efforts to recover and then surrender any copies thereof that he knows are in the possession of

10 others), including, but not limited to: United States passport, voter registration card, and other voting

11 documents.

12 **IT IS SO ORDERED.**

14 Dated: August 29, 2013

15 _____
   Maria-Elena James
16 United States Magistrate Judge

29